UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| RODNEY WORLEY, *et al.,* | CASE NO. 5:23-CV-156-KKC |
| **Plaintiffs,** | |
| v. | **OPINION and ORDER** |
| 500 MEMORIAL DR KENTUCKY, LLC *et al.,* | |
| **Defendants.** | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant 500 Memorial Dr. Kentucky, LLC's ("Memorial Kentucky") Motion for Summary Judgment. (R. 56.) Being fully briefed, this motion is ripe for review. For the following reasons, Defendant Memorial Kentucky's Motion is GRANTED IN PART and DENIED IN PART.

## I.    FACTUAL BACKGROUND

This action arose from the execution of a Contract for Purchase and Sale (the "Contract") between Plaintiff Rodney Worley and Defendant Memorial Kentucky to acquire real property located at 500 Memorial Drive, Nicholasville, Kentucky (the "Property"). The central issue is whether a misrepresentation in the Owner's Affidavit, stating that the only existing lease was dated February 17, 2022, constitutes a breach of contract or amounts to fraud.

The Property consists of four large industrial buildings totaling 196,119 square feet. (*See* R. 67-3 at 7.) Until February 2022, ALBAAD USA, Inc. ("Albaad") owned the Property. (R. 56 at 1.) From June 19, 2019, until February 2022, Dry Care, LLC ("Dry Care") had an

oral lease ("Oral Lease") with Albaad. (*Id.* at 2.; R. 58-9 at 1). Dry Care occupied buildings 1 and 3 in full, and 35,000 square feet of building 2, for a total of 112,740 square feet. (*Id.*)

Defendant Memorial Kentucky purchased the Property from Albaad on February 18, 2022 for $2,860,000. (R. 56 at 2.) The day before the purchase, Defendant Memorial Kentucky and Dry Care entered a February 17, 2022 lease ("February 17 Lease"). The February 17 Lease was not signed by Memorial Kentucky. (R. 58-9 at 2.)

Defendant Memorial Kentucky asserts that shortly after the purchase, Dry Care contacted it regarding the February 17 Lease, stating that "there's a mistake." (R. 56 at 2.) The parties then purportedly executed a revised agreement dated February 21, 2022 (the "February 21 Lease"). (*Id.*) The validity of both February 17 and 21 Leases are heavily contested. (*See* R. 56 at 5; R. 58 at 3, 5–6.)

During the same period, Worley also tried to purchase the Property from Albaad. (*Id.*) On February 23, 2022, Worley reached out to Albaad requesting to contact Defendant Memorial Kentucky in hopes to either rent space or purchase the Property. (*Id.*) Worley was avidly pursing the Property as he had an immediate need for more warehouse space due to his company's rapid growth. (*Id.* at 3.) Because of this, he made multiple offers to purchase the Property for well over the price Defendant Memorial Kentucky had just purchased it for. (*Id.*) On February 23, 2022, Worley made a $3,400,000 offer in his very first email to Yoel Isreal, the selling agent for Memorial Kentucky:

> Yoel,
>
> My company Automated Cutting Technologies, Inc. is growing so fast I am having a hard time keeping up with how much space I need. . . .
>
> If you had not purchased the building I had hoped to purchase it. This would have given me the flexibility to use the remaining 110,000ft² in that building that is not currently being used as flex space for my operation. I would have been able to use some of the space for the two new businesses as needed. Sometimes I need no space, sometimes I need so much I have to truck and use warehouses in Lexington.

Like the current tenants in the building, I have a lot of machinery that is not easy to move and I really only want to move it into a space that I own with no risk of ever having to move it again. To that end, I have discussed this with my bank and they have approved me to offer you $3,400,000 for the building you just purchased. Are you interested I selling for a quick $500,000 in profit? I understand you may be involved with the current tenant and I would love to keep them in the building for long term at a really good rate if I were to purchase the building.

Is this something you would be interested in discussing further?

(R. 56-4 at 16–17.) The following week, Worley sent Isreal another email, unilaterally raising his offer to $3,750,000. (*Id.* at 12.) His offers were rejected. (*Id.* at 11.)

On March 25, 2022, Worley and Defendant Memorial Kentucky agreed to a $4,000,000 purchase price. (R. 56 at 4.) During this time, Worley knew that Dry Care was leasing part of the Property but did not know the specific terms of the lease. (R. 58 at 3.) Additionally, Worley knew that he was "paying about a million-dollar premium over the appraised value as it sits now." (R. 56 at 4.) Closing was scheduled for June 7, 2022. (*Id.* at 6.)

The Contract expressly represented and warranted that "the only lease of the property is to Dry Care, LLC, a true and complete copy of which has been delivered to [Worley]." (R. 58 at 3.) In accordance with this representation, Defendant Memorial Kentucky emailed Worley a copy of the February 17 Lease on March 16, 2022. (*Id.*) The Contract was also contingent upon Worley "reaching a satisfactory agreement with Dry Care, LLC to modify the Industrial Lease Agreement dated February 17, 2022." (*Id.*) In reality, however, Dry Care's leasing status was far less certain than the Contract suggested.

On March 30, 2022, Worley met with Dry Care owner Max Shor and Yoel Isreal, during which Shor claimed he only had a verbal lease and denied entering into the February 17 Lease. (R. 56-4 at 5.) Despite the uncertainty surrounding the lease, Worley proceeded towards closing without first securing a new agreement with Dry Care, because he "knew [he] could live with" the existing lease. (*Id*; R. 58 at 4, 8.) In an April 5 email to Isreal, Worley

3

reiterated that he was "not concerned about the lease," as he would "get it figured out" and emphasized that the issue was "for me and [Dry Care] to work out" and had "no bearing on the sale of the property." (R. 56-4 at 5.)

On May 3, 2022, the Property was appraised at $4,050,000 with the valuation being subject to an "extraordinary assumption" that Dry Care would terminate its current lease and execute a new lease. (R. 56 at 5.) During that time, Worley continued to investigate the status of Dry Care's lease. A May 13 2022 letter from Worley to Dry Care acknowledged that he "received inconsistent information about the status [of the lease and] understand you take the position that there is no written lease binding the current (or any future) owner of the building." (R. 56-7 at 2.) In that letter Worley instructed Dry Care to "begin making arrangements to vacate the property" unless it entered into a new lease with him. (R. 67 at 9.)

On June 2, 2022, five days before the closing, Defendant Memorial Kentucky's member and manager Zalman Skoblo signed an Owner's Affidavit. The Owner's Affidavit stated, in relevant part:

> 3. Owner is entitled to possession of the Property, and there is no other person or entity in possession who has any right in the Property except for Dry Care pursuant to a Lease dated February 17, 2022 ("the Lease"). The Lease is in full force and effect, has not been amended, modified or supplemented , and as of this date, no breach exists on the part of the Owner under the Lease and to Owner's knowledge, no breach exists on the part of Dry Care under the Lease.
>  . . .
> THIS AFFIDAVIT, is made for the purpose of inducing…500 Memorial Drive, LLC, a Kentucky limited liability company, to purchase the Property…Affiant [Skoblo] agrees to indemnify and hold harmless…500 Memorial Drive, LLC against any damages, or expenses including attorney's fees, sustained as a result of any of the foregoing matters not being true and accurate…

(R. 58 at 4.)

The closing took place on June 7, 2022. (R. 56 at 6.) On that date, Worley assigned his rights under the agreement to co-Plaintiff, 500 Memorial Drive, LLC ("500 Memorial") an

4

entity he created to take title to the Property. (R. 58 at 3.) As part of the closing, Defendant Memorial Kentucky assigned the February 17 Lease to Plaintiff 500 Memorial. (*Id.* at 5.)

Although the closing occurred as scheduled, Dry Care's occupancy status remained uncertain. (R. 56-9 at 5.) As a result, Worley sent a letter to Dry Care on June 7, 2022, directing it to vacate the property. (*Id.*) In response, Dry Care emailed Worley on June 20, 2022, asserting that it was not bound by the February 17 Lease and that the February 21 Lease controlled. (*Id.*) This email was the first time Worley or Plaintiff 500 Memorial learned of the February 21 Lease. (R. 58 at 5.) The February 21 Lease had "at minimum, 30 significant and material differences" from the February 17 Lease. (R. 56-9 at 5.) Dry Care took the position that the February 21 Lease was binding on the new owner. (*Id.*)

This leasing dispute resulted in Plaintiff 500 Memorial suing Dry Care in two Kentucky state court actions. (R. 67 at 5.) Plaintiff 500 Memorial sought a declaratory judgment as to the terms and conditions governing Dry Care's occupancy of the leased premises and an order evicting Dry Care. (R. 58 at 5.) Although not a party to that suit, Skoblo executed an affidavit stating that the June 2 Owner's Affidavit mistakenly referred to the February 17 Lease. (*Id.*) Skoblo stated that this was a typographical error, and the actual lease between Dry Care and Defendant Memorial Kentucky was the February 21 Lease. (R. 58-6 at 1.)

After an evidentiary hearing, the Jessamine Circuit Court entered its Findings of Fact, Conclusions of Law, and Judgment. (R. 58 at 5.) Relevant here, it found the following:

- "[T]he Court does not believe [that Worley] had seen, or agreed to the terms of, the February 21 Lease prior to June 7, 2022."
- "The Court doubts the February 21 Lease was prepared and executed prior to June 7, 2022."
- "[500] Memorial has introduced into evidence a comparison between the two Leases and the Court agrees with Worley that they are materially different."

5

- "[T]exts and emails among Worley, Shor, and Isreal from April 6 through June 3, 2022 . . . confirm that Shor did not believe there was any written Lease in effect at the time [500] Memorial purchased the property."
- "The Court finds Dry Care has no Lease to the Property that is binding upon [500] Memorial."
- "The Court finds that Dry Care had no written lease."

(R. 58-9 at 3–4.) Additionally, the Jessamine Circuit Court awarded Plaintiff 500 Memorial $154,861.60 for past-due rent, court costs, and 6% interest. (*Id.* at 6.) Defendant Memorial Kentucky asserts that Plaintiff 500 Memorial has been unable to collect the judgment from Dry Care. (R. 56 at 7.)

The Plaintiffs subsequently filed this action against Defendant Memorial Kentucky and Skoblo in Kentucky state court. (*Id.*) The Defendants removed the case to this Court. (R. 1.) Plaintiffs later filed an amended complaint asserting claims for (1) breach of contract, (2) fraud, (3) unjust enrichment, and (4) punitive damages. (R. 32.) This Court dismissed Skoblo as a named party. (*See* R. 43.) Defendant Memorial Kentucky thereafter moved for summary judgment. (R. 56.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden and must identify "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and quotation marks omitted). All evidence, facts, and inferences must be viewed in favor of the nonmoving party. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "In order to defeat a summary judgment motion, . . . [t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that

6

party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III.  ANALYSIS

Defendant Memorial Kentucky presents five arguments in support of its motion for summary judgment: (1) Worley lacks contractual privity with Memorial Kentucky and thus has no standing to pursue claims in his individual capacity; (2) Plaintiffs' breach of contract claim fails because the validity and effect of the February 17 Lease was not a material term to the Contract; (3) Plaintiffs' fraud claim fails because they cannot establish reliance on the February 17 Lease to their detriment; (4) Plaintiffs unjust enrichment claims fails because there is an enforceable contract in place; and (5) Plaintiffs cannot establish damages for any of their claims. (R. 56 at 9–19.) The Court will address Defendant Memorial Kentucky's arguments in turn.

### A.  Worley's Individual Capacity Claims

Defendant Memorial Kentucky argues that Worley surrendered his legal rights in this action when he assigned the Contract to 500 Memorial on June 7, 2022. (*Id.* at 9.) The Plaintiffs' response indicates that Worley does not intend to pursue claims asserted in his individual capacity. (R. 58 at 2 n.1.) Accordingly, all claims asserted by Worley against Memorial Kentucky will be dismissed.

### B.  Unjust Enrichment

Plaintiffs also bring a claim for unjust enrichment. (R. 32 at 7.) Defendant Memorial Kentucky correctly argues that when a party possesses an enforceable contract, a plaintiff cannot bring an unjust enrichment claim as a matter of law. (R. 56 at 18 citing *Furlong Development Co., LLC v. Georgetown-Scott Cnty. Planning Comm'n*, 504 S.W.3d 34, 39 (Ky. 2015).) Plaintiffs do not contest this and voluntarily relinquishes their unjust enrichment

7

claim. (R. 58 at 2 n.1.) Accordingly, the Court will grant summary judgment in favor of Defendant Memorial Kentuck on the unjust enrichment claim.

### C. Punitive Damages Claim

Count IV of the Plaintiffs' Amended Complaint asserts a claim for punitive damages and attorney's fees. (R. 32 at 8.) "Punitive damages is not a standalone claim in Kentucky." *Correll v. Mut. of Omaha Ins. Co.*, No. 6:19-CV-97-REW-HAI, 2023 U.S. Dist. LEXIS 187028, 2023 WL 6880385, at *7 n. 12 (E.D. Ky. Oct. 18, 2023). Instead, a punitive damages claim is merely a "a remedy potentially available for another cause of action." *Petrey v. Ethicon, Inc.*, Civil Action No. 5:19-298-DCR, 2019 U.S. Dist. LEXIS 180314, 2019 WL 5295185, at *3 (E.D. Ky. Oct. 18, 2019) (citation and quotation marks omitted); *Ammon v. Welty*, 113 S.W.3d 185, 188 (Ky. Ct. App. 2002) (explaining that punitive damages are only available when claims are asserted on which actual damages can be awarded). Accordingly, Plainitffs' stand-alone punitive damages claim will be dismissed.

### D. Issue Preclusion

Before addressing the merits of Plaintiff 500 Memorial's claims, the Court must address a threshold issue. Defendant Memorial Kentucky contends that Plaintiff 500 Memorial is collaterally estopped from asserting its claims based on the existence of the February 21 Lease because the Jessamine Circuit Court already "found" that the February 21 Lease did not exist before closing. (R. 67 at 10.)

A federal court deciding whether to apply issue preclusion to an earlier state court judgment must first examine the issue preclusion law of the state in which the judgment was rendered. *Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315, 317 (6th Cir. 1997) (quoting *Marrese v. Am. Acad. of Orthopedic Surgeons*, 470 U.S. 373, 375 (1985)). Because the Jessamine Circuit Court issued the Judgment, Kentucky law governs here.

In Kentucky, issue preclusion has five requirements that must be met in order for the doctrine to bar further litigation. *Miller v. Admin. Office of Courts*, 361 S.W.3d 867, 872 (Ky. 2011). The requirements are as follows:

> (1) at least one party to be bound in the second case must have been a party in the first case; (2) the issue in the second case must be the same as the issue in the first case; (3) the issue must have been actually litigated; (4) the issue was actually decided in that action; and (5) the decision on the issue in the prior action must have been necessary to the court's judgment and adverse to the party to be bound.

*Id.* (quoting *Yeoman v. Kentucky Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998)) (internal quotation marks omitted). Issue preclusion requires that "[t]he issues in the former and latter actions … be identical." *Id.* It is an "essential element" of collateral estoppel that the party to be bound in the second case must be the "prior losing litigant." *Moore v. Cabinet for Hum. Res.*, 949 S.W.2d 317, 319 (Ky. 1997) (citing *Sedley v. City of West Buechel, Ky.*, 461 S.W.2d 556, 559 (1971)).

There is no dispute that Plaintiff 500 Memorial was a party in the Jessamine Circuit Court action, so the first element is met. The second element, however, is not satisfied because the issues are not identical. In the state action, the question was whether Dry Care had any lease (oral or written) that was binding on Plaintiff 500 Memorial's right to possess the Property.  The Jessamine Circuit Court issued a judgment that "Dry Care has no Lease to the Property that is binding upon Memorial" and "had no written lease." (R. 58-9 ¶¶ 20, 21.)

In this case, however, the dispositive issue is whether Defendant Memorial Kentucky's contractual representation and affidavit stating that the only lease was the February 17 Lease, were false at the time of closing and thereby constituted a breach (and, separately, fraud). Because the prior case focused on Dry Care's rights against Plaintiff 500 Memorial, and this case focuses on Defendant Memorial Kentucky's duties and warranties

9

to its purchaser, the issues are not "identical" as Kentucky requires for issue preclusion. *Yeoman*, 983 S.W.2d at 465.

The third element favors Defendant Memorial Kentucky. The state court conducted a three-day evidentiary hearing in which live testimony and exhibits were presented regarding circumstances surrounding the February 21 Lease. (R. 58-9 at 6.)

The Fourth element is a much closer call. Kentucky law requires that the issue be "actually decided," not merely discussed. *Yeoman*, 983 S.W.2d at 465. Here, the state court stated that it "doubts the February 21 Lease was prepared and executed prior to June 7, 2022." (R. 58-9 ¶ 10.) This language is tentative, and does not indicate that a definitive finding was made on when the February 21 Lease came into existence. Moreover, the state court's ultimate judgment that no lease bound Plaintiff 500 Memorial's rights in the Property did not depend on the precise date the February 21 Lease was drafted or executed. The state court held that neither the Oral Lease nor the February 17 Lease created rights enforceable against 500 Memorial and that Dry Care had no binding lease at all. This holding does not actually decide when the February 21 Lease came into existence, rather, the court merely "doubts" that it was created before June 7, 2022. (*Id.*) Even if the Court were to find in favor of Defendant Memorial Kentucky on this element, there are others that remain unsatisfied.

The fifth element is not satisfied because Plaintiff 500 Memorial was not "a prior losing litigant." *Moore*, 954 S.W.2d at 319. The state court ruling was favorable to 500 Memorial, finding that Dry Care had no lease. This finding does not support preclusion because the purpose its to "prevent parties from relitigating issues necessarily determined in a prior proceeding." *Gregory v. Commonwealth, Ky.*, 610 S.W.2d 598, 600 (1980). 500 Memorial is not attempting to re-litigate the February 21 Lease to get out of a previous judgment. Instead, it uses the existence of the February 21 Lease (which Defendant Memorial Kentucky acknowledges in its briefing) for its breach of contract theory against a new

10

defendant. This important distinction is necessary to prevent the application of collateral estoppel to a situation where it is not warranted.

Because the second, fourth and fifth elements are not satisfied, Defendant Memorial Kentucky cannot invoke issue preclusion to bar Plaintiff 500 Memorial's breach-of-contract or fraud claims. The prior state judgment resolved whether Dry Care had any enforceable lease rights against Plaintiff 500 Memorial. It did not decide whether Defendant Memorial Kentucky fulfilled its contractual obligation to provide a true and complete copy of "the only Lease of the Property" and to truthfully attest that the February 17 Lease was unamended and in full force and effect. Whether the February 21 Lease was in existence before the closing is an extremely important fact that will help decide the claims in this case. Precluding litigation on this key issue because a similar issue was previously addressed in state court would be an unwarranted extension of collateral estoppel beyond its intended scope. Accordingly, issue preclusion does not shield Defendant Memorial Kentucky from potential liability, and the Court can move forward in addressing the substance of Plaintiff 500 Memorial's claims.

### E. Breach of Contract and Fraud Claims

The Court finds the record to be incredibly confusing. Both parties, and particularly Defendant Memorial Kentucky, have advanced inconsistent and convoluted positions seemingly tailored to their desired interpretations of the state court's January 13, 2023 Judgment. For instance, in its Motion for Summary Judgment, Defendant Memorial Kentucky presents as fact that "[s]hortly after closing, Dry Care reached out concerning the February 17 Lease stating 'there's a mistake,' which resulted in a revised lease dated February 21, 2022." (R. 56 at 2.) That statement aligns with the affidavit of Mr. Sklobo filed in the state court action, which identified the February 21 Lease, not the February 17 Lease, as the agreement in place. (R. 58-6 at 1.) Yet, when addressing the breach of contract and fraud

claims here, Defendant Memorial Kentucky advances the opposite position and urges this Court to give preclusive effect to the state court's conclusion that the February 21 Lease was invalid. (R. 67 at 11.)

Construing the facts in the light most favorable to Plaintiff 500 Memorial, the Court concludes that genuine disputes of material fact exist. A reasonable jury could find a breach where the Contract identified the February 17 Lease as the only existing lease and could find that the alleged breach caused Plaintiff 500 Memorial damages. (R. 58 at 3.)

Similarly, a reasonable jury could determine that Defendant Memorial Kentucky's representation that the February 17 Lease was "in full force and effect" was knowingly false. The record contains evidence suggesting that Defendant Memorial Kentucky and Dry Care understood that the February 17 Lease did not govern their relationship. (R. 56-4 at 5.) Moreover, the absence of Defendant Memorial Kentucky's signature on the February 17 Lease (R. 58-9 at 2) provides additional support for a finding that the representation was false. Because these material factual disputes remain unresolved, summary judgment on the breach of contract and fraud claims must be denied at this time.

## IV.  CONCLUSION

For the aforementioned reasons, the Court hereby ORDERS that Defendant Memorial Kentucky's Motion for Summary Judgment (R. 56) is GRANTED IN PART and DENIED IN PART:

1) All claims asserted by Plaintiff Rodney Worley in his individual capacity are DISMISSED.

2) Defendant Memorial Kentucky's Motion (R. 56) with respect to the Unjust Enrichment claim is GRANTED;

3) Defendant Memorial Kentucky's Motion (R. 56) with respect to the stand-alone punitive damages claim is GRANTED; and

4)   Defendant Memorial Kentucky's Motion (R. 56) with respect to the breach of

contract and fraud claims is DENIED.

As a result of this Opinion, the remaining claims in this action are for breach of

contract and fraud.

This 24th day of March, 2026.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**